REED (GILLESPIE v.). See Case No. 5,436.

---

## Case No. 11,646.

### REED v. HUSSEY.

[Blatchf. & H. 525.] [1]

District Court, S. D. New York. Aug. 2, 1836.[2]

PLEADING IN ADMIRALTY—JOINDER—ANSWER—
ACTIONS—SEAMEN—SHARES—SHIPPING ARTICLES—SALVAGE SERVICES—COSTS.

1. The non-joinder of proper respondents in an action in personam can be taken advantage of only by plea in abatement.

2. The practice of courts of admiralty admits matter of abatement to be set up in the answer, but the answer must, in such case, demand the same judgment, and be subject to the same rules, as if a formal dilatory plea had been employed.

3. Where, in a suit in personam, a respondent cannot be arrested, a foreign attachment may issue against his property in the hands of third persons, to compel his appearance; and such process is appropriate, in admiralty, for that purpose alone.
[Cited in Cushing v. Laird, Case No. 3,508; The Alpena, 7 Fed. 363.]

4. Where, in a suit in admiralty, property in the hands of a third person is arrested, on a claim to a specific lien upon it, that constitutes the suit a suit in rem; and it is not a foreign attachment, whether the third person holds the property as owner of it in his own right, or as trustee of the debtor.

5. A foreign attachment supposes that the property proceeded against belongs to the debtor, and not to the garnishee, and seeks to make the garnishee the debtor of the libellant, to the value of the property, in case the primary debtor does not appear in the cause or satisfy the decree.

6. Property purchased bona fide by the holder of it, is not subject to a foreign attachment; but a proceeding against it must be sustained as one strictly in rem.

7. A suit in rem imports, ex vi termini, that a particular thing is chargeable with the demand and is subject to arrest therefor.

---

[1] [Reported by Samuel Blatchford, Esq., and Francis Howland, Esq.]

[2] [Modified by circuit court. Case unreported.]

8. Where, before the institution of a suit in rem, the thing proceeded against in the libel had been deposited with or acquired by agents, with full notice to them of the libellant's claim upon it, and on its arrest the agents intervened in the suit by stipulation, and answered the libel at large, *held*, that the suit might be treated as a suit in personam against them.

9. Agreements by which seamen are to receive for their services a share of the profits of the voyage, are not partnerships, but contracts of hiring, and the shares so agreed upon are wages, and are recoverable as such; and this is so whether the compensation is to be made in kind or in money.

[Cited in Chapline v. Conant, 3 W. Va. 516.]

10. Under shipping articles for a fishing voyage, which give to the seamen shares of all that shall be obtained during the voyage, to be received by them as soon after the arrival of the ship in her home port as the voyage can be made up, they become entitled to shares only in so much cargo as is brought safely to the home port.

[Cited in Duryee v. Elkins, Case No. 4,197.]

11. If, under such articles, part of the cargo be lost on the voyage home, the seamen are entitled to receive their proportions only out of the residue which arrives home in safety, and not out of the original cargo.

[Cited in The Antelope, Case No. 484.]

12. The maritime law does not render the ship-owner, in any sense, an insurer for the safe delivery of such cargo; and the seamen's wages, if consisting of a share of the cargo, must depend upon the successful termination of the voyage.

13. Where goods are saved and brought into the port of destination by salvors, the ship-owner is not entitled to freight on such goods; nor can the seamen recover wages, as such, though the salvage be effected in part by their services.

14. If a seaman does not claim wages in such case, but claims a proportion of the cargo, as quasi owner of it, that interest may be equitably secured to him, subject to the proper charges for salvage and transportation; or, having participated in the salvage service, he may, as salvor, claim a part of the cargo, proportioned to the value of his wages.

15. Where seamen contract to be paid by a share of the freight or of the proceeds of a voyage, they cannot, in case of wreck, claim compensation for salvage services, or more than day wages for the time actually employed in saving the wreck.

[Cited in The Antelope, Case No. 484; The Aguan, 48 Fed. 322; The C. P. Minch, 61 Fed. 513.]

16. The sixth section of the act of congress of July 20, 1790 (1 Stat. 134), which provides that all the seamen having cause of complaint of the like kind against the same ship or vessel shall be joined as complainants, if not imperative upon all the seamen to join in a prosecution already begun by a shipmate for the wages of a common voyage, at least removes all occasion for separate actions, and all equity to costs, where such separate actions are instituted.

17. An after action by a seaman, nominally in rem, but so inaptly shaped as to become, in effect, an action in personam against the agents or trustees of the owners, will not carry separate costs to either party.

These actions, one in personam, against Frederick Hussey, a part owner of the ship Franklin, and the other in rem, by John Monroe, against the remnants of the ship and the proceeds of part of her cargo, were brought by two seamen to recover wages for their services on board that vessel, on a whaling voyage to the Pacific Ocean, and also salvage for saving portions of the apparel and cargo from her wreck, on the coast of Brazil. It appeared that, in June, 1831, the Franklin sailed from Nantucket on a whaling voyage. The libellant Henry Reed went out in her. The other libellant, Monroe, shipped at Callao, Peru. Each of them signed the shipping articles, by which Reed was to have a lay of one one hundred and twenty-fifth, and Monroe a lay of one one hundred and twentieth, "of all that shall be obtained during the voyage." Nantucket was the home port of discharge. The ship obtained, during her voyage, from 1,300 to 1,350 barrels of oil, 100 barrels of which were shipped to the United States in another vessel, and were received and sold by the owners. In March, 1834, the Franklin left the whaling ground and sailed for the United States. The master, the mate and five seamen died on board, between Cape Horn and the Falkland Islands, and the command devolved on the third mate, who put into Montevideo in distress. The vessel remained at that port about a month refitting, and having, with the assistance and advice of the consul, shipped there a first mate and five seamen, at monthly wages, sailed for the United States about the middle of August, 1834. On the 5th or 6th of October, about midnight, she was wrecked on the Diego Roderiguez Shoals, off Coraipa, on the coast of Brazil. She struck upon a rock about six miles from shore, and bilged, and was entirely lost. With the assistance of lighters and persons from the coast, and with the aid of her crew, three anchors and a part of her rigging and a quantity of the oil which composed her cargo, were got on shore. During the period they were at work on the wreck, the upper works of the ship broke off in a gale, and were driven ashore, carrying 150 or 200 barrels of oil. In all, 450 barrels were saved. The oil, in many of those which reached the shore, was lost from leakage. The persons who were employed in saving the cargo were engaged at first under the authority of the British consul, and, subsequently, under that of the American consul, as soon as his interference could be obtained. The master stated in his testimony that the crew were employed for forty-five days in saving and securing the cargo, about a fortnight of which time was employed on the wreck. The persons hired on the coast were paid sixty-two and a half cents per day. Laborers were abundant at that price. A vessel was chartered, which brought to New-York the oil saved and the remnants of the ship, and they were all sold at auction, under the direction of Josiah Macy & Sons, who were the claimants of the proceeds of the oil, as agents or trustees of the owners. The nett surplus, over and above all dis-

bursements, held by them for the owners, was about $717. The expenses of saving the property and transporting it to this country were all discharged by the American consul. The ship's company, except the libellants and the master, were discharged at the place of wreck, their claim of wages being satisfied by the consul. Those payments were brought into the account as part of the charges and disbursements. The oil was worth at the place of wreck twenty cents per gallon, and would not, if sold there, have defrayed the expenses incurred there. Both of the libels charged that the ship was intentionally run on shore and wrecked by the master. The evidence in support of this allegation consisted only of the testimony of the libellants themselves, each testifying for the other. The other facts are sufficiently set forth in the opinion of the court.

John A. Morrill, for libellants.

Charles Walker, for claimants and respondents.

BETTS, District Judge. The libellants present their demands under two aspects: (1) That they are entitled to recover the value of their respective shares in all the oil obtained during the voyage, notwithstanding the shipwreck; or (2) that they are entitled to an allowance for salvage services, equivalent to the wages they would have received had the whole cargo been delivered in this country. The claimants and respondents urge, against the maintenance of the actions, some objections which apply in common to both suits, and some which apply only to the one or the other of them.

It is contended, that if the libellants will be ultimately entitled to recover wages, their right was not mature when the suits were instituted, as the owners had not then received the nett proceeds and made up the voyage, even admitting that, under the articles, the libellants could recover without showing the arrival of the ship at Nantucket. The seamen are, by the articles, entitled to their wages "so soon as the oil can be sold and the voyage made up by the owners." It does not become necessary, however, to advance any opinion as to what may be regarded, in behalf of seamen, as a satisfaction of this condition; for the proof is, that all the oil was, in point of fact, sold before these suits were brought. There is also ground for reasonable presumption, that the accounts of the voyage were made up within the purview of the articles; because, it appears that a statement was given to the seamen, by the owners of the ship, of the proceeds of the voyage and of some small balance due them, which was offered to be paid. One suit was brought on the 9th of March, and the other on the 14th. The oil had been all sold, and the proceeds accounted for to the owners of the ship, on the 7th. There would, therefore, seem to have been a compliance with the articles to the letter, on the part of the libellants; and, their right of action being perfect, the court cannot deny them the benefit of it, on account of any unnecessary hastiness or ill-temper evinced in commencing the suits.

The other objections to the suits are, that the action in personam cannot be maintained against Hussey alone for the recovery of the whole of Reed's wages; and that the action in rem cannot be sustained, because it is not founded upon the arrest of any property in possession of the claimants, which is subject to the charge sought to be enforced against it. If the objection because of the non-joinder of all the owners in the action in personam, can be made available in this court, that can only be done by means of a plea in abatement, or of an answer having the constituents of such a plea. Abb. Shipp. (Ed. 1829) 82, and note. The answer sets up the fact that Hussey is only one-eighth owner, and gives the names of the other owners, but does not take exception to their not being joined in the action. If the practice of the court permits matter appropriate to a dilatory plea to be brought forward by answer, yet the answer must demand the like judgment, and be subject to the same proceedings, as if a formal plea had been employed. This objection, therefore, cannot be maintained, and the action may proceed against the single defendant as if he were the sole owner. The argument in opposition to the other objection is founded upon the assumption that the suit by Monroe is a proceeding by way of foreign attachment. But that could not have been the object of the attachment, because Hussey had been already arrested and held to bail in the suit against him in personam; and an arrest of his goods by foreign attachment would have been useless and nugatory, because his actual appearance fulfilled all that could have been exacted under that attachment. Rules 25, 26, 27 (Ed. 1838). Besides, the action is impetrated against the oil and the remnants of the wreck, as being specifically subject to the claims of the libellant. The libel sets forth a case which, upon the face of it, entitles the party to hold the remnants of the wreck for the satisfaction of a part, if not the whole, of the demand, and makes out a strong probable right to attach the oil also. It alleges a sale of the oil to Josiah Macy & Sons, and obviates any privilege they might claim in the character of purchasers, by averring that the "sale was made to them, and that they purchased, with full notice of the claims of the libellant," and prays process of attachment against the specific articles sold, "and also against the goods, chattels, credits and effects of Frederick Hussey, to compel his appearance." This, then, is a regular suit in rem. It goes against property in possession of the respective claimants, upon an al-

legation of its liability to the claim, and is accompanied with a monition to those parties to appear and answer the libel under oath. The right to maintain it must be tested, then, by the rules which are applicable to actions in rem, founded upon a lien on the thing arrested.

The advocate for the libellant contends, that the appropriate steps were taken in this manner, by foreign attachment, to compel the appearance of Hussey, by impounding the proceeds of his property in the hands of third persons. This is clearly a misapprehension of the proper mode of proceeding. The right to a foreign attachment is not to be determined from the frame of the libel. because the libel need not demand one. Such an attachment is required when a personal arrest of the defendant cannot be made,—Rule 25 (Ed. 1838); Hall, Adm. 60–70,—and is, therefore, founded upon the return of the marshal to the warrant of arrest. The libel prays, in a loose and indefinite way, an attachment against the goods, chattels, credits and effects of Frederick Hussey, to compel an appearance. Yet process in conformity to that prayer would not authorize the seizure of property, unless it was in Hussey's actual or constructive possession. Neither the rights nor the possession of a third party could be interfered with or disturbed under a warrant couched in terms so latitudinarian and uncertain. If Hussey's property, in the hands of third persons, was sought to be seized, the names of the holders and the purpose of the proceeding should have been specified, to constitute them garnishees and to make the foreign attachment a regular means of redress. It is manifest that the property of Josiah Macy & Sons is not subject to arrest, to compel the appearance of Hussey; yet, that is the bearing and object of the proceeding as it is interpreted by the libellant's counsel. The right of property in the oil, as between Hussey and Macy & Sons, is asserted to be in the latter. It would, then, be most inapt and irregular to arrest their property, with a view to coerce Hussey's appearance. It would be no prejudice to him if their property should be sequestered for his debt; and, therefore, a distringas upon that property, with intent to compel his appearance in the cause, would never be permitted by the court. No credits or effects are pointed out in the libel as existing anywhere and belonging to Hussey, which might be subject to arrest by the attachment asked for; nor is it averred that the proceeds of the things claimed, if they be sold, are held by Macy & Sons as the funds of Hussey. A foreign attachment operates, by force of law, to render the garnishee, instead of the respondent. the debtor or depositary of the libellant; and it can have no foundation except in relation to effects and credits which actually belong to the respondent. Clerke. Praxis Adm. (by Hall) tits. 28, 32, and notes; Manro v. Almeida, 10 Wheat. [23 U. S.] 473; Bouysson v.

Miller [Case No. 1,709]. Had the regular course of practice been pursued in the present case, the garnishees would not have been put to the expense of appearing in and contesting a suit to which they are made parties, but would have been acquitted of all responsibility on conforming to the rules of this court in that behalf,—Rules 28, 29, 40 (Ed. 1838),—and filing the proper affidavit or stipulation. Those rules are designed to relieve parties who have no interest in a controversy, from all expense or inconvenience in respect to funds in their hands, which are the subject of conflicting claims between others. If the order of the judge endorsed upon the libel, "that process issue, according to the prayer thereof," was obtained with a view of complying with the twenty-eighth rule, still, it must appear that the prayer presents a case for a foreign attachment; otherwise, an order in such general terms will not authorize its employment. The order would rather seem to indicate that the libellant was allowed, upon the case he presented, to arrest the property of third persons because it was acquired by them with full notice of his rights and liens. than to constitute them debtors to or garnishees for him because of their being in possession of such property or its proceeds for him.

It now appears most manifestly, that the libellant well knew, when his suit was instituted, that the oil and effects saved from the wreck were none of them in the possession either of Hussey or of Macy & Sons, but had all of them been previously sold at public auction by a regular auction house, and that the proceeds of the sale came in that manner into the possession of Macy & Sons; and that, therefore, there was no foundation for a suit in rem against the oil in specie. That form of action imports, ex vi termini, a thing to be arrested. Where none exists, the action is as inapt and fruitless as a warrant in personam would be against a party who had never been within the jurisdiction of the court, or against one who was deceased. The process, in the present case, did not go against the proceeds in the hands of Macy & Sons, and they might, therefore, have disregarded the monition, (the suit not resting upon any personal responsibility of theirs independent of the property to be attached,) and not have appeared to the action, being no way required to do so by the mandates of the court. All the parties having, however, elected to appear by proper stipulations, and to answer the libel at large, the court may consider the case as placed upon the same footing as if the property demanded had been attached and the claimants had intervened in respect thereto; and, if a clear right is established by the libellant to obtain relief, or to receive the funds held by Macy & Sons, such relief may be given, notwithstanding the informalities and inaptitudes of the mode of procedure. The formal objections to the maintenance of the actions are, therefore, overruled. As

the second suit does not rest upon any attachment of property, but solely on the appearance and stipulations of the claimants, it becomes in effect, nothing more than a suit in personam, entitling the libellant to no other remedy than if he had instituted it only by citation or by personal arrest of the parties; and, therefore, in the disposition of the costs of these suits, the question both as to the necessity and the right of these double actions will be considered.

The extent of the right of the libellants in the oil taken on the voyage, forms the merits of their cases, and must be considered and disposed of. Two propositions are advanced by them: (1) That they are entitled to recover an equivalent for their full lay or share in the entire quantity of oil taken and laden on board, without diminution on account of losses by wreck or by perils of the sea; (2) or that, if their right is limited to the quantity saved from the wreck, they are entitled to full shares in that, without bearing any of the charges at the place of shipwreck, or in the transportation of the oil from Brazil to this port. The libellants contend that they are entitled to full wages, upon the terms of the contract and the principles of maritime law, and also because the ship was designedly stranded by the master, and the stipulated termination of the voyage was thus prevented by an act of malfeasance for which the owners are responsible. The court will not now assume to decide what the rights of seamen may be in such a voyage, when the vessel is voluntarily wrecked by the master, or is lost through want of skill or culpable neglect. There will, probably, be no serious difficulty in discovering the principle which should govern a case of that character, when it occurs. It is sufficient for me to say now, that, in my opinion, the libellants prove no misconduct or want of seamanship and precaution in the navigation of this ship at the time of her disaster.

The right to full wages is placed mainly, however, upon the supposed tenor of the shipping articles, and upon the assumption that the hazard of the transportation of the cargo was thrown exclusively on the shipowners. Agreements by which seamen are to participate in the adventure, and to derive their reward from its success, are now rare, and are probably limited, in commercial experience, to privateering and fishing voyages. Abb. Shipp. (Ed. 1829) 432; Barney v. Coffin, 3 Pick. 115; Baxter v. Rodman, Id. 435. But, anciently, it was a very usual, and apparently the original method of hiring. Laws of Oleron, arts. 3, 8, 16; Laws of the Hanse Towns, art. 24; Ordinances of Louis XIV. b. 3, tit. 4, art. 7; Jac. Sea Laws, 132. Such agreements do not constitute partnerships, but are merely a hiring of the seamen, and the shares agreed upon are wages, and are recoverable as such,—Abb. Shipp. (Ed. 1829) 432, note; Wilkinson v. Frasier, 4 Esp. 182; The Frederick, 5 C. Rob. Adm. 8; Giles v.

The Cynthia [Case No. 5,424]; 3 Kent, Comm. 185; Barney v. Coffin, 3 Pick. 115,—though Pothier styles them a species of contracts of partnership,—5 Poth. 360; Cont. du Louage des Matelots, 161. Upon these principles, then, the shipping articles, whether stipulating a compensation in kind or in money, would be subject to the same rules of interpretation, and, in securing to seamen like rights, would also subject them to the same duties and obligations. By the articles in the present case, the seamen engage to perform the whaling voyage specified, in consideration of the shares or lays to be paid them, and the owner promises, upon these conditions, to pay the shares of the nett proceeds of all that shall be "obtained" during the voyage, as soon after the return of the ship to Nantucket as the oil can be sold and the voyage be made up. The performance by the seamen is in substance a condition precedent to the payment to be made by the owner, and is made rather more distinctively so by the restrictions as to the time and place at which the owner's responsibility shall attach, than is imported by the ordinary stipulations in a shipping contract. This court may undoubtedly, in the exercise of its equitable powers, dispense with a literal fulfilment of the conditions in this description of engagements, and may regard acts which are substituted by agreement, express or implied, between the parties, or which are compelled by the exigencies of the voyage, to be equivalent to an exact compliance with the articles,—The Minerva, 1 Hagg. Adm. 347; The George Home, Id. 376; Harden v. Gordon [Case No. 6,047],—but still it must search for and require an observance of the contract in its essential features, as it is the contract alone which creates or gives efficacy to the rights of the parties. But it is supposed that there is a peculiar force in the expression "obtained," used in the articles, which secures to the seamen a right to be paid their lays in all the oil taken and laden on board the ship during the fishing voyage. This term is not to be construed per se, without regard to its context in the contract; and, if it be read in reference to the subject-matter, there can be no ground to doubt that it has relation to the entire period of the service, the completion of the service being an essential part of the undertaking, and a consideration for the wages to be paid. The agreement of the sailors was not merely to take fish, nor was the contract of the owners to pay the stated compensation for that service alone. The contract on one side was to perform a voyage, consisting of the outward run, the fishing service and the return to the port of discharge; and the contract on the other side was, to pay the lays stipulated, when they should be adjusted, on the completion of the voyage. The contract incontrovertibly imports, that the products to be shared are not "obtained," within the contemplation of the parties, until they are

brought safely to the port of destination. This construction of the articles also necessarily results from the relationship of the seamen to the subject-matter. They have no property in the oil itself. They cannot claim to have aliquot parts measured off and delivered to them, either abroad or at home, as being joint owners of the commodity. Both by the terms of the agreement, and by the rules of the law maritime, their interests rest alone in the proceeds realized from the sale of the articles obtained. Abb. Shipp. (Ed. 1829) 432, note; 3 Kent, Comm. 185; Wilkinson v. Frasier, 4 Esp. 182. It is also to be considered, that this was a contract for an entire voyage, and that, in such a case, upon general principles, seamen cannot claim wages for the performance of a part only, unless there has been freight earned before reaching the final port of discharge. Abb. Shipp. (Ed. 1829) 447, and notes; Giles v. The Cynthia [Case No. 5,424]; The Two Catharines [Id. 14,288].

It is supposed, that because the owners are bound to furnish a sufficient ship for the service and the voyage, they are obliged to bring back, at their own risk, the cargo procured in the adventure—that, in effect, they become insurers for the safe delivery of whatever is put on board. This is not a stipulation of the contract, and there is no known principle of maritime law which imposes or sanctions such an obligation. By the American and the English law, the seamen's right to recover wages depends upon the successful termination of the voyage; and a loss of the voyage, by wreck or capture, takes away, as a general rule, their right to claim wages,—Abb. Shipp. (Ed. 1829) 457, and note; 3 Kent, Comm. 188; 1 Bell, Comm. 512,—except where the owner is entitled to freight pro rata itineris,—Luke v. Lyde, 2 Burrows, 882; Laws of Oleron, art. 4,—and, in that case, the better modern doctrine is, that seamen, whether hired for the voyage or by the month, can claim pro rata wages,—3 Kent, Comm. 189; 1 Bell, Comm. 512–515. This principle may secure them a proportionate compensation out of the 100 barrels of oil transmitted home by another conveyance, and received by the owners; but it has no application to the main cargo. That a sound construction of the contract will only entitle the libellants to their shares of the oil brought to the home port, is further illustrated by a consideration of the principle by which the right to wages is made to depend on a participation in the earning of freight. Upon that principle, the seamen recover their wages only on the safe performance of the voyage, because in that event alone does freight accrue. Roccus says, that when the sailor has an interest in the freight and cargo in lieu of wages, and the ship sustains an injury from accident, or the mariner does not perform the voyage, he is bound to contribute to the loss, and cannot recover wages. De Nav. note 43 (Ingersoll's Transl.) p. 46. The

regulations of the Laws of Oleron were of like import. The seaman who hired for part of the freight, was obliged to continue with the master to the port of destination. Article 19. See, also, articles 8 and 16, and Cleirac's observations therein, as illustrative of the character of these contracts. The Ordinance of Louis XIV. directs that seamen going by the profit or freight, shall not pretend to any wages for equipping, or damages if the voyage be broken up, retarded or prolonged by a superior force, whether before or after the departure of the ship (liv. 3, tit. 4, art. 7), because, as Valin observes, the crew are bound to abide the good and bad fortune, and run all the risks of the ship (1 Valin, Comm. sur l'Ord. 700). And, in case some freight is realized by the ship, the mariners participate in that, according to the terms of their contract (Ord. liv. 3, tit. 4, art. 9); and Valin says their compensation or wages are limited to that portion (1 Valin, ad loc. 703). Pothier is manifestly of the same opinion, as he declares the contract to be a copartnership. 5 Poth. 360; Cont. du Louage des Matelots, 161.

It seems, then, that there is no foundation in the shipping articles or in the principles of maritime law, to sustain the claims of these libellants to full shares in all the oil laden on board during the voyage; that their compensation depends upon the proceeds realized from it here; and that they bear the risks of the perils of the sea in its transportation home. This is more appropriately so in relation to voyages like the one in question here, inasmuch as the law allows the seaman to effect insurance on the oil after it is laden on board (1 Phil. Ins. 55), while such security is prohibited in regard to money or wages (Hughes, Ins. 15). With respect to the 450 barrels of oil saved from the wreck, and brought to this port in a vessel chartered for the purpose, I shall hold that the libellants are entitled to their lays out of its nett proceeds. The general principle is, that goods brought in by salvors, although the ship's company were chiefly instrumental in effecting the salvage, do not entitle the ship-owner to freight, nor the seamen to wages, because the delivery of the goods is not made in pursuance of the contract. Dunnett v. Tomhagen, 3 Johns. 154. The distinction may, however, I think, be taken between that case and the present one, that, when goods are brought in by salvors, the contract of affreightment is superseded and annulled by the salvage service, and the owner cannot be required to satisfy both the ship-owner and the salvor; whilst here, the demand of the seaman is in the character of quasi owner, being for part of the thing produced, and he has to bear, together with the other owners, the charges of salvage, and those of new affreightment when the goods are not transshipped by the original ship-owner. But the right to compensation out of the salved property may furthermore be deduced from the

rule, that every part of the vessel and of her freight saved by the aid of the seamen, is bound for the payment of their wages, and that it matters not whether the recompense be made in the name of wages or as salvage. Abb. Shipp. (Ed. 1829) 451; The Neptune, 1 Hagg. Adm. 227, and foreign ordinances there cited; 3 Kent. Comm. 195. The recovery must be limited, however, to the nett proceeds, and cannot cover the value of the oil here, free from the charges for salvage and transportation. The voyage, as to the shipping adventure, ended with the shipwreck. This is a case of superior force, spoken of in maritime codes, which breaks up the contract, and deprives the seamen of the wages agreed upon. They have an equity, however, proportionate to their demands, which adheres to whatever portion of the cargo may be realized here (1 Valin, Comm. sur l'Ord. 703; Code de Commerce, liv. 2, tit. 5, No. 259); and, to that extent, this court will protect their rights in this case. They are subject to a share of the charges, because it is principally on account of their liability to bear those charges, that the rule which deprives them of all claim to wages, on the loss of freight voyages, is not deemed to apply to fishing adventures.

The libellants demand a salvage compensation for their services in rescuing the property from the wreck and securing it on shore. They were employed about forty-five days before the goods were re-shipped, and about a fortnight on the wreck. The rule seems to be invariable, however, that seamen who are compensated by a share of the freight or of the proceeds of the voyage, cannot, in case of wreck, claim for salvage service. The only extra compensation they can demand is, to be paid by the day for the time they are engaged in saving the wreck. Laws of Oleron. art. 3; Ord. de Marine, liv. 3, tit. 4, art. 9; 1 Valin, Comm. 703; Code de Commerce, liv. 2, tit. 5, arts. 260, 261. The daily wages of laborers at the place of wreck were sixty-two and a half cents. I shall, however, consider the services of the crew as much more valuable. They were more under the control of the officers, and were stimulated by a common interest to exert themselves with greater activity and more usefully than laborers picked up along shore. The services actually performed by them were in a high degree laborious, and, to a considerable extent, perilous to themselves. For these reasons, I think two dollars a day, for fourteen days, ought to be allowed to each of the libellants.

The recovery of the libellants, then, will be as follows: To each his share, according to the articles, in the nett proceeds of the 100 barrels of oil sent home during the voyage; and to each his like share in the nett proceeds of the 450 barrels of oil sold at this port, with the privilege, on the reference before the clerk, of surcharging with respect to the amounts of the expenses and disbursements against the property, if they shall be advised

that they ought to be exempt from bearing any parts thereof, or that the charges are excessive. A reference will be ordered to the clerk, to ascertain the amount to be decreed in conformity to these principles. Monroe will be allowed no costs in his action. It has already been shown that that suit is, in effect, an action in personam. Accordingly, the remedy in the two suits is concurrent and identical, and no reasonable cause is shown for having separated them. Both were brought by the same proctor, nearly simultaneously in point of time, and both of the seamen could have joined in one suit. The practice of this court, in conformity to the spirit of the statute (Act July 20, 1790, § 6; 1 Stat. 134), is, to allow any of the members of a crew to come in, on summary petition, and enjoy the advantages of a prosecution instituted by a shipmate, to recover the wages of a common voyage. If the act is not to be construed as imperative, and as compelling the union of all the mariners in one suit, to recover the wages of the same voyage, it, at all events, removes every occasion for different actions, and takes away all equity to costs when different actions are instituted. Had the claimants in the suit in rem been arrested, or their property been attached, so as to compel their appearance, I should have awarded them costs against the libellant; but, as their defence has been wholly voluntary and gratuitous, it ought not to entitle them to charge the expenses upon the sailor. Whether the libellant in the other action shall recover or pay costs, will be reserved for consideration until the coming in of the clerk's report. Decree accordingly.

NOTE. This case was appealed to the circuit court, where Judge Thompson held (December 20th, 1837) that the decision of the court below was in all respects correct, upon the proofs adduced before it. But, on the new proofs given on appeal, the court ordered a decree for the claimants and respondent on the merits. As, however, no reason was shown why those new proofs had not been given on the hearing in the court below, the decree for the libellants (which included taxed costs to the libellant Reed) was modified, by deducting from it $138, and neither party recovered against the other costs on the appeal. [Case unreported.]