COFFIN (GODDARD v.). See Case No. 5,-490.

___

## Case No. 2,948.
### COFFIN v. JENKINS.
[3 Story, 108.][1]
Circuit Court, D. Massachusetts. May Term, 1844.

WHALING VOYAGE — FORFEITURE OF LAY BY DESERTION—ADMIRALTY—PRACTICE — PLEADING — VERIFICATION—NEW MATTER ON APPEAL.

1. A lay or share in the proceeds or catchings of a whaling voyage does not create a partner-

___

[1] [Reported by William W. Story, Esq.]

ship in the profits of the voyage, but is in the nature of seamen's wages, and governed by the same rules.
[Cited in Joy v. Allen. Case No. 7,552; Macy v. De Wolf, Id. 8,933.]

2. By the general maritime law, desertion is an unauthorized absence from the ship, with an intention not to return, and it creates a forfeiture of wages.

3. The statute of the United States [Act 1790; 1 Stat. 133] declaring any unauthorized absence of a seaman from his ship for forty-eight hours to be desertion, applies to all cases, where the seaman does not return within such time, although he may have been prevented by the sailing of the ship. For the ship is not bound to wait for him, but he is bound to rejoin the ship within that period, suo periculo.
[Cited in The John Martin, Case No. 7,357; Welcome v. The Yosemite, 18 Fed. 384.]

4. In the present case, it was *held*, that the circumstances showed, that the desertion by the plaintiff was the result of a previous and deliberate intention to desert; and at all events, an opportunity having been offered to him to rejoin his ship within the forty-eight hours, that his refusal to do so constituted a desertion, and he had thereby forfeited his wages.

5. The only cases where desertion does not carry with it a forfeiture of wages, are cases having mitigating circumstances, where the party deserting has a strong excuse, founded on gross misconduct or harsh usage towards him; or where, having a locus poenitentiae, he has acknowledged his fault, and offered to return to his duty within a reasonable time, and his services have been rejected; or cases of a similar nature.
[Explained in Swain v. Holland, Case No. 13,661.]

6. The doctrine in case of Cloutman v. Tunison [Case No. 2,907], affirmed.

7. In cases of appeal from the district court, this court is very cautious in admitting new matters of defence or allegation to be introduced, where the facts, on which they rest, are not new or newly discovered, but were perfectly known at or before the hearing in the district court.
[Cited in The Mabey, 10 Wall. (77 U. S.) 420; The Saunders, 23 Fed. 304; The Venezuela, 3 C. C. A. 319. 52 Fed. 875; Re Hawkins, 147 U. S. 486. 13 Sup. Ct. 521.]

8. The answer to a libel should be sworn to by the respondent, but the libellant is not bound to swear to the libel.
[Cited in The J. R. Hoyle, Case No. 7,557.]

9. A special replication by the libellant under oath is not admissible, unless it be demanded by the respondents, or ordered by the court, and then it is in the nature of a cross-bill or reconventio of the civil law.
[Cited in The Atlantic, Case No. 620.]

[Appeal from the district court of the United States for the district of Massachusetts.]

Libel in the admiralty for the lay or share of the libellant, the second mate of the whaling ship Columbus, against the respondent [Peter Coffin], the master of the ship. The libel in substance stated, that in June, 1835, the libellant, John Jenkins, shipped on board the ship Columbus, of Nantucket, of which the respondent was master, on a whaling voyage from Nantucket to the Pacific ocean, as second mate, for a certain lay or share of the said voyage and of the oil which might

be obtained; that he signed the shipping articles, and went aboard the said ship on the 10th day of the said June, and entered into the service of the same as second mate. That the ship proceeded forthwith, with the libellant on board, to the Pacific ocean, and obtained 41,948 gallons of sperm oil; that he continued on board, and in the service of the said ship until about the 10th day of June, 1838, when, without reasonable or sufficient cause, and without fault or neglect on his part; and while he was engaged in the performance of his duty, under the orders of the master, in looking after certain seamen, who had deserted from the said ship, he was abandoned and left at Talcahuana, on the coast of Chili, by the said respondent, and was prevented from rejoining the ship, as she never returned to the port. That the said Coffin, well knowing, that the libellant was engaged in the performance of his duty. after wilfully abandoning the libellant as aforesaid, cruised about for the space of two months for more oil, and then returned to the said Nantucket, where he arrived on the 30th day of November, 1838. That during all the time the libellant was on board, he well and truly performed his duty as second mate, according to his best ability, and was obedient to all the lawful commands of the said master, and is entitled to his lay, amounting to $512.33, with interest. The libellant then prays, that the aforesaid wages be decreed to him.

The answer admitted, that the libellant was hired, and that the ship proceeded to sea and put in to Talcahuana, as set forth in the libel, at which place it alleges, that the said libellant wilfully and without cause, or pretence for cause, deserted from the said ship. It then proceeds to aver, that the libellant did not well and faithfully perform his duty on board the said ship, but often neglected it, and slept upon his watch, and permitted the men to sleep, to the injury of the vessel and the voyage. That the said Jenkins was ashore with the respondent on or about the 15th of June, 1838, the latter being in quest of seamen, to supply the places of four seamen, who had deserted, and that, having shipped four men, he ordered the libellant to return to the ship, and direct the mate to heave in the slack of the chain, and be ready to take in the anchor as soon as he, the respondent, should return to the ship with the four men, and then to return to the shore in the boat, and to wait by it until the respondent should arrive with the four men. That the said libellant returned to the ship, and gave the said orders, and returned with the boat and two or three hands to the shore. That when he was on board, in pursuance of the said order, he procured from his chest his best clothing, which he tied up in a bundle, and took with him in the boat, without the knowledge of the mate. That when he reached the shore, instead of remaining with the boat, he took the said

bundle of clothing, and went up to the town of Talcahuana, and that the said respondent did not again see him during the voyage. That when the said master arrived with the four men to the boat, not finding the said Jenkins, and learning where he had gone, he sent the hands in search of him, but that they could not find him, and that then the respondent returned to the ship with the men, and found it ready to sail. That the ship was to have sailed, as Jenkins well knew, as soon as the said master returned, and would have sailed forthwith, but for the absence of the said Jenkins. That when the respondent arrived aboard the ship, he returned to search for Jenkins, directing the mate to get under weigh and proceed to the entrance of the harbor, if the master did not return at night. That the said master then proceeded to the town, and in company with Benjamin F. Coffin and a person by the name of Bates, whom he employed, searched through the town for Jenkins, but without success. That they then proceeded to the office of Paul Delano, American consul at that port, and asked his advice, and that he advised him to proceed to sea. That the master then returned to the ship, and anchored at the entrance of the harbor in full sight of the town, and remained there till the next morning, for the space of thirty hours, in order that Jenkins might return, if he chose, and then commenced beating out of the harbor with a head wind. That he verily believes, that the said Jenkins did not mean to return, but intended to desert, and denies that the said Jenkins was left without sufficient cause. That after the said Jenkins deserted, the ship proceeded on her voyage, and arrived at Nantucket about the middle of November, 1838; that the said Jenkins remained at Talcahuana until September last past, when he might well have returned before, and that the said respondent verily believes, that the said Jenkins deserted with the intention of remaining and residing at that place. That after the return of the said Jenkins, the said respondent believes, that the said Jenkins transferred all interest in the voyage to George B. Elkins. To this answer, which was not sworn to, a special replication was made by the libellant.

The decree of the district judge at the hearing of the cause was for the libellant, that he recover the sum of $500 and costs of suit; from which decree the present appeal to this court was taken. The cause was now heard upon the original evidence, and also upon new evidence, and was argued by—

Charles P. Curtis, for appellant.
Crowninshield & Choate, for appellee.

STORY, Circuit Justice. This cause has been argued at great length; but after all, it turns upon a single inquiry, and that is, whether there has been a desertion on the part

of the libellant, during the whaling voyage, by which he has, according to the principles of the maritime law, forfeited his right to his lay or share in the proceeds and catchings of the voyage. This lay or share does not, according to law, create any partnership in the profits of the voyage, as has been sometimes erroneously supposed; but it is in the nature of wages for seamen in the common merchants service, and is governed by the same rules. This opinion was adopted by Lord Alvanley in Wilkinson v. Frasier, 4 Esp. 182; and more recently in the court of exchequer, in Perrott v. Bryant, 2 Younge & C. Exch. 61; in Mair v. Glennie, 4 Maule & S. 240; by the court of king's bench, and by the supreme court of Massachusetts in Boston, in Baxter v. Redman, 3 Pick. 435. in Rice v. Austin, 17 Mass. 197, 203, 206, and in Grozier v. Atwood, 4 Pick. 234. The same doctrine was held by Lord Stowell in The Frederick, 5 C. Rob. Adm. 8. Indeed, I consider it too well settled now to admit of any reasonable doubt. See Story, Partn. § 42.

In respect to desertion, there is no doubt, that it constitutes, by the general maritime law, a forfeiture of all title to wages, and to rights in the proceeds in the nature of wages. And by desertion, in the sense of the maritime law, is meant, not a mere unauthorized absence from the ship without leave; but an unauthorized leaving or absence from the ship, with an intention not to return to her service, or, as it is often expressed, animo non revertendi, that is, with an intention to desert. The statute of the United States, for the regulation of seamen in the merchants service—Act 1790, c. 56, § 5 [1 Story's Laws, 104; 1 Stat. 133, c. 29]—has created an auxiliary statute desertion, distinct from and independent of that of the maritime law, and it declares, that forty-eight hours' absence from the ship without leave, if a proper entry thereof is at the time made in the log book, shall be deemed a desertion and a forfeiture of all wages due to the party. This subject was fully discussed and considered in the case of Cloutman v. Tunison [Case No. 2,-907], and to the doctrine there stated I adhere with unhesitating confidence. But I advert to it in this connexion simply to answer an argument, suggested at the bar, that, under this statute, if a seaman should, without leave, voluntarily absent himself from the ship at the time, when she is about to sail from the port on the voyage, nay, when she is about to weigh anchor, for the very purpose, and she should actually sail on the voyage before the forty-eight hours had elapsed, it would not, in the sense of the law, amount to a statute desertion; because he would not have the opportunity of rejoining the ship within the forty-eight hours. In short, the argument went to this, that it was not a desertion at all, either by the maritime law or under the statute, unless, at the time of the seaman's leaving, he left it with the intent absolutely to desert, or animo non

revertendi. To this doctrine I cannot, in any manner subscribe. I understand the statute to declare, that an absence from on board the ship without leave is a forfeiture of his wages, and a desertion, unless he actually rejoins the ship within forty-eight hours; and that it is at his own peril, under such circumstances, to absent himself; and if he is unable to rejoin the ship, whether by reason of her sailing on the voyage or otherwise, within the forty-eight hours, the forfeiture is complete and absolute. The ship is not bound to wait for him; but he is bound to rejoin the ship within that period, suo periculo. But I should go farther and say, that if, upon the eve of the departure of the ship from the port on the voyage, a seaman should, with a full knowledge of the fact of her intended departure, voluntarily or secretly without leave quit the ship, that would of itself be strong prima facie evidence of a positive intention to desert, and it would require the fullest and clearest evidence of bona fides, and sincerity of intention, to displace the presumption.

Now, in the present case, it appears to me, that there are very strong circumstances, which go to establish a meditated intention to desert, and an effectual execution of that intention. I agree, that it is not to be presumed, that an officer of a ship does intend an act of such gross disobedience and departure from duty, which must weaken public confidence in his character, and take from him, in many cases, the means of future support. I agree further, that, in the present case, there was apparently a large lay or share due to the libellant, and that a very strong motive to desert seems to be taken away. I say apparently a large lay or share due to him, for, there is no direct evidence to show, satisfactorily to my mind, what his real interest therein was at the time when he left the ship. It is true, that no assignment was, in fact, made of his lay or share, until after his return home, two years or more after the supposed desertion. But then, of the facts and circumstances attending that assignment, the consideration actually given for it, and the occasion of making it, we have no strict or searching account. I should have been glad to know, whether the assignee was the agent of the libellant during his absence, and had made advances to his family during his absence upon the whaling voyage, and was entitled to reimbursement therefor out of the lay or share, and that the assignment was made on that account to him; or whether he made a bona fide purchase thereof at the time of the assignment, and what value, if any, he paid or was to pay therefor. There are circumstances in this case which imperatively require some explanations on this head. In the first place, the assignment was made at a time, when the owners had refused to pay the lay or share. There was not merely a controversy, but a defence founded upon the supposed

desertion, intended to meet the lis mota, if a suit should be brought. Men do not ordinarily, under such circumstances, buy up law suits at a fair or reasonable price, but as a matter of desperate, even if it be lawful, speculation.

In the next place, certain declarations are asserted to have been made by the libellant, which point to his interest in the lay or share. Benjamin F. Coffin says, "While we were at Talcahuana, in the afternoon of the day before Mr. Jenkins left the ship, he told me, that if Captain Coffin would not discharge him, he should run away. He said, that it was of no use for him to go home; that he should have nothing to receive if he went home." Now Coffin's testimony has been assailed, with intense zeal and strength of expression, as false, and deliberately false. If it stood alone, it might perhaps not be sufficient to found a safe judgment upon it. But if the intention to desert is, as I think it clearly is, made out upon other independent evidence of acts and declarations, it certainly furnishes no reason to suspect, that Coffin has not here uttered the truth. Certainly, if the statement imputed to the libellant was false in point of fact, "That it was of no use for him to go home, that he should have nothing to receive if he went home;" he could have shown that by proofs of substantial, subsisting interest, before or at the time of the assignment. Yet he has left this part of the case a blank, although it was peculiarly within his privity and knowledge how the matter really stood. But passing from this, let us proceed to other important considerations in the case. In the first place, it is admitted, that the libellant, in consequence of some part, which the respondent took in some difference between the libellant and Swain, (the third mate of the ship), favorable to the latter, was discontented and dissatisfied with the respondent, and requested repeatedly to be discharged. The respondent refused, and advised the libellant to go home in the ship. In the next place, the libellant, on the morning of the sailing of the ship, went on shore with the respondent, and returned by his orders to the ship, with directions to the chief mate to heave short the anchor, or to get the ship under weigh. The ship was hove short and did get under weigh. The libellant returned to the shore, having put on a pair of new duck trousers over his others then on, and took also a bundle of clothing with him tied up in a handkerchief. He left on board a quadrant; and some few other things, which were, however, but of trifling value. When he left the ship, he bade Swain, (the third mate), "Good-bye," a circumstance, not of itself, ordinarily, of much significance, and yet not wholly without effect, under circumstances like those in the present case, especially considering, that there had been some difficulty between Swain and the libellant.

The question here naturally meets us, what did the libellant go ashore for, and why did he carry a bundle of clothing? His excuse or justification is, that he had sold the clothes to a person on shore, and that he was absent from the boat, hunting for deserters from the ship. Neither of these suggestions is, in my judgment, satisfactorily or probably made out. It was of little use, without the knowledge or consent of the master, who had hired other men in lieu of the deserters, who were then either on board or going on board, to search for deserters, when the anchor was a-trip for the voyage, or the ship under weigh. That was a time for speed and watchfulness, and not for fruitless searches. As little is there in the other suggestion. If the libellant was to go the voyage, he would or might want these clothes in the course of the return voyage, and if he had really sold them, he would seem to have left himself with scarcely a decent supply. Putting on the new duck trousers over those he then had on, could not be for sale, and scarcely for immediate use, if he was then about to go to sea. But if he intended to desert, both the clothes and the trousers might be important. I do not dwell on these facts, because, although they inflame every suspicion, they do not constitute the ground, upon which my judgment rests. Let us look to the subsequent acts and declarations of the libellant after he was on shore, and the ship was gone. He then said in the presence of Orpin, who belonged to another ship, in a billiard house, "That he did not intend to go out in the ship which he came in." This would almost seem decisive of his intention to desert, if he could not obtain his discharge. But turn to the other facts. The ship went below about eight or nine miles distance, and there came to anchor, and did not sail until the next day. Did the libellant make even the slightest effort to get on board the ship, although it is most clearly in proof, that boats could have been obtained, and were going down to the island where the ship lay? The answer, which is admitted on all sides, is, that he made no such effort. Nay, the masters of two other ships offered in their own boats to send him to the ship. But he declined. We have the testimony of one of these masters, and it is admitted to be above all exception; and he (Capt. Hussey), states a motive for the desertion, which cannot be misunderstood or winked out of sight. Capt. Hussey deposes to a conversation, which he had with the libellant a few days after the Columbus sailed. It occurred at the boarding house of a Mr. Bates. He says; "I said to Mr. Jenkins, I suppose you left Capt. Coffin with an expectation of joining my ship. (I was in want of a second mate.) Mr. Jenkins said, that he did. I told him, that I did not feel at liberty to ship him, because Capt. Coffin might think I enticed him to leave the Columbus." In addition to this, Capt. Hussey states, that while the Columbus was going down the harbor, not three miles off, and

could have been easily reached by a boat, he, being in company with Capt. Shearman, of the ship Orozimbo, offered to send the libellant on board. His language is, "Both Capt. Shearman and myself advised Mr. Jenkins to go on board of the Columbus. We said that we did not think he was doing right to leave Capt. Coffin, and that we would man a boat, taking some of Capt. Shearman's men, and the rest of mine, and would put him on board of the Columbus, if he would go. He said he thought he could do as well there on shore, and declined our offer."

Now, what was the duty of the libellant upon this occasion, and under these circumstances? It clearly was, to seek to rejoin the ship, if he did not mean to desert. It was a duty, which he owed not merely to the respondent, but to the owners. His services might be most important and valuable to both, under certain exigencies, on the voyage home. He chose to remain behind. What pretence then can there, in reality, be for him now to say, that he did not mean to desert, when, in fact, he chose not to rejoin the ship? In truth, it is most manifest, that he left the ship and not the ship him. He chose to be a voluntary absentee, and even if, at first, he meant to return, or doubted whether or not he could return, his subsequent refusal to go on board pronounces it, ab initio, a desertion. We are to judge of men by their acts as well as their words; and if the libellant had, as he now suggests he had, no intention to desert, because he had an interest in the proceeds of the voyage, how happens it, that he did not rejoin the ship and take care of that interest? How happens it that he remained abroad afterwards for two years? He has no right now to say, I went from the ship, hoping and expecting to be left behind; and I was, by my own fault and with my own consent, left behind, contrary to my duty; and I meant to avail myself of this fault and dereliction of duty to escape the forfeiture, which is attached to desertion; and my acts are now to be construed as if I did not finally intend to desert, but simply never to rejoin the ship. I trust that the law is strong enough to inform him, that what a man does, at least where the act is voluntary, is presumed to be purely what he intended to do, ab initio. The maxim, "finis coronat opus," although not precisely intended to meet such a case, does not fail to illustrate it. It is, at best, absence consummated by desertion. But it is said, that if this is a case of desertion, it is one, in which the court is not bound to inflict a total forfeiture; but may mitigate it to a remunerative or moderated compensation. There are, without question, cases, where desertion will not be visited by a total forfeiture of wages, or quasi wages. But what are the cases to which the mitigation of compensation is applied? They are those, in which the party has a strong excuse, founded on gross misconduct or harsh

usage on the other side; and where the party is, therefore, more in the situation of a victim than of a sinner; or where, having a locus poenitentiae, he has acknowledged his fault, and offered to return to duty within a reasonable time, and his services have been improperly rejected. It is to such cases, and cases of a similar nature, that the rule of compensation or mitigation is, in the benignity of the maritime law, fairly and justly and upon principles of public policy, applied. Here, there is a total absence of all exculpatory and alleviating circumstances. The opportunity for repentance or return was given, and was not embraced; but was deliberately and obstinately refused. Under such circumstances, it appears to me, that this court would ill perform its duty, if it did not pronounce for a total forfeiture. It is not the case of an ignorant seaman; but of an officer of the ship. My judgment accordingly is, that the decree of the district court ought to be reversed, and that the libel be dismissed with costs for the appellee, the original respondent.

Mem.—In the course of the present cause, the respondent asked leave to file an amendment to his answer, insisting upon a new point of defence in the circuit court, which had not been presented in the district court. It was, in effect, that no suit in a case of this sort, being in the whale fisheries, lay against the master; but only against the owners or other agents in possession of the proceeds of the voyage. The motion was opposed by the counsel for the libellant.

STORY, Circuit Justice. I do not think that, under the circumstances, the amendment ought to be allowed. The matter of defence must have been well known when the cause was in the court below, and ought then, if ever, to have been insisted on, as, if well founded, it disposed of the whole suit. This court ought, in all cases, to be very cautious in admitting any new matters, either of allegation or of defence, to be introduced here, where the facts, on which they rest, are not new or newly discovered; but were perfectly known at or before the hearing in the district court. We should otherwise constantly have appeals here entertained upon matters never brought to the notice of the district court, and might virtually exercise an entirely original jurisdiction instead of an appellate jurisdiction. The rule, "in appellatio a sententia de finitiva licet non allegata allegare et non probata probare," has many limitations, and requires many. See Combe, Pr. Adm. tits. 54, 60; 1 Browne, Civ. & Adm. Law, 499, 500; 2 Browne, Civ. & Adm. Law, 415, 416, 457. I observe, too, that there are some irregularities in the present case. The libel is sworn to, but not the answer. The reverse is the usual and proper practice, although there is no objection to the libel being sworn to, if the libellant

chooses. But the answer should be sworn to, and indeed, I do not remember to have seen an answer before, which was not sworn to. Then, again, the libellant has put in and sworn to a special replication, without being called upon by the respondent to answer the allegations in the answer. This is irregular; according to the modern and correct practice, no special replication is admissible, unless the respondent requires the libellant to give an answer on oath to the matters propounded in his own answer, and then it is in the nature of a cross bill, or reconventio of the civil law. Story, Eq. Pl. § 402. It is, therefore, the privilege of the respondent to require such a reply, but not a right of the libellant to put it in, without its being demanded by the respondent, or specially ordered by the court. Motion to amend denied.