## UNITED STATES v. PETERSON et al.

Circuit Court of Appeals, Ninth Circuit.
August 20, 1928.

No. 5399.

Geo. J. Hatfield, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal.

J. N. Gillett and H. H. North, both of San Francisco, Cal., for defendants in error.

Before RUDKIN, DIETRICH, and HUNT, Circuit Judges.

HUNT, Circuit Judge. In this action defendants in error, plaintiffs below, recovered judgment against the United States for damages occasioned by interference by the United States with the American sealing schooner James G. Swan. In its general character the action is like Bird v. United States (C. C. A.) 24 F.(2d) 933, in that it is based upon a claim of the plaintiffs below, heirs and legal representatives of an American citizen, for damages for loss occasioned by or resulting from the seizure, detention, or interference with a voyage, by the United States, of vessels charged with unlawful sealing in Bering Sea and waters contiguous thereto and outside of the three-mile limit during the year 1891 (Act June 7, 1924, 43 St. 595 [28 USCA § 52]). The judgment was for $17,873.45, apportioned between two causes of action, one for interference with and seizure of the Swan in 1899, and the other for interference with the ship in 1891. The United States does not dispute the propriety of the judgment for $4,042.35, as to the first cause of action, nor does it dispute that a judgment was properly given in favor of plaintiffs upon the second cause of action; but it is urged that upon the second cause of action the judgment for $13,873.45 was excessive, because of an error of law in fixing damages.

The complaint in the second cause of action averred that the Swan, 44 tons net, was enrolled in 1891 in the state of Washington; that the schooner was two-thirds owned and operated by an American citizen, Chestoqua Peterson, predecessor of the plaintiffs; that she regularly cleared from Port Townsend on May 9, 1891, for a fur seal hunting voyage to the North Pacific Ocean and Bering Sea; that she was fully equipped and provisioned for the voyage, and carried a crew of 18 men under a master, with 8 two-men hunting boats; that while on her voyage, and in specifically stated latitude and longitude on the high seas, and more than one marine league from the shore, she was boarded by officers of a United States revenue cutter, who warned the master not to hunt seal in Bering Sea under penalty of seizure and forfeiture; that because of this warning the schooner abandoned her sealing voyage, returned to her home port, and thereby lost profits which she might have made. The answer was a general denial.

It was stipulated that the pelagic fur seal hunting season in Bering Sea began about July 1st and extended to about September 15th; that the average catch of a small hunting boat in Bering Sea for the season of 1891 was 300 seals to a boat manned by a hunter and two men, 200 seals to a boat manned by a hunter and one man, and 100 seals to a boat manned by a hunter alone; that the average cost of shooting a seal was 5 cents per seal; that the average cost of feeding a crew of a sealing vessel was 15 cents per day per man; that the value of sealskins to the owner during 1891 was $14.233; that Chestoqua Peterson was an American citizen, and that his heirs are as set forth in the complaint.

It was shown that the schooner cleared for the North Pacific Ocean on May 9, 1891, and returned on July 21, 1891; that when in a certain named position in Bering Sea she was

boarded and warned by United States officers on July 2, 1891; that the schooner had eight two-men hunting boats and a crew of 18; that the boats were all dug-out canoes, such as were used by Indians on the North Pacific Coast; that included in the crew of the Swan were white men and 10 or 12 Indians and 3 or 4 half-Indians. A witness, a half-Indian, called by plaintiffs, testified that he and some other men, who were white, shipped on lay, whereby they received a percentage of the value of the skins when sold, and that he believed the vessel got one-third and the men in the boat each received one-third.

In behalf of the United States there was evidence that there was a custom by which the Indians who shipped on sealing vessels during the years 1884 to 1893 would receive two-thirds of the skins caught, the hunter and steersman each getting one-third, and the vessel getting a third; that during the years just referred to the Indians were from Neah Bay. Several witnesses, Indians, testified in effect that the custom among the Indians shipping on sealing vessels was for payment in thirds, two-thirds going to the canoe and one-third to the schooner; that the Indians owned some of the skins, and the ship owned some, and that the owner of the vessel sold the skins and settled with the Indians. One witness said that among the Indians coming from Neah Bay it was the custom for the Indians to receive "two-thirds to the canoe and one-third to the schooner"; that the hunter owned his share, and the steersman owned his, and the schooner owned hers. Another witness said that, while upon a voyage he had once made upon another ship, the Indians operated on shares; that there was a regular way of bargaining with the Indians in the Bering Sea and a way on the coast; that they did not give the Indians the skins, but bought them from them at an agreed valuation. The court made findings of wrongful interference, found the damages as heretofore stated, and entered judgment accordingly.

We cannot agree with the contention made by the government that the Indians, seal hunters on the ship, were co-owners of the sealskins caught by them. Although the testimony concerning the conditions under which they worked was not as satisfactory as it might have been, nevertheless, in the absence of direct evidence that there was any special agreement under which the Indian members of the crew worked, we think the whole evidence justified the conclusion that all members of the crew were working on a lay, and not as partners or cotenants with the owners of the vessel. United States v. Laflin (C. C. A.) 24 F.(2d) 683; The Ocean Spray, 18 Fed. Cas. 558, No. 10,412; Reed v. Hussey, 20 Fed. Cas. 440, No. 11,646. It therefore follows that their shares are to be treated as wages recoverable as such, whether the compensation was to be made in kind or money. Coffin v. Jenkins, 5 Fed. Cas. 1188, No. 2,948. Under the facts, it became the right and duty of the owners of the ship to bring action. They are trustees of any money that may be recovered for damages caused by the interference with the voyage, and are charged with a trust for the payment of the claims of the officers and crew of the vessel. United States v. Laflin, supra; Joy v. Allen, 13 Fed. Cas. 1163, No. 7,552.

The case being within the principles stated recently by this court in United States v. Laflin, supra, and the damages having been correctly ascertained, further discussion is needless.

The judgment is affirmed.