ALBANY,
August, 1810.

SCHIEFFELIN
and another
v.
HARVEY.

———————

SCHIEFFELIN and another *against* HARVEY.

The master and owners of a ship are responsible for the goods which they have undertaken to carry, if stolen or embezzled by the crew or any other person, though no fault or negligence may be imputable to them.

Where goods were shipped at *New-York,* to be delivered at *London,* and on the arrival of the ship, the goods were refused admission, being prohibited by the laws of *England,* and the consignee and master agreed, that the goods should remain on board, and be returned to the shippers in *New-York,* at their risk, they paying the freight from *London ;* and an endorsement was made on the bill of lading to that effect ; it was held, that the ship-owner was responsible for the embezzlement of any part of the goods, between the time of the first shipment at *New-York,* and their return there, though *English custom-house officers* were on board, during the time the vessel was in *London,* and though they may have embezzled the goods, and not the master or crew, or any person with their knowledge.

THIS was an action of *assumpsit.* The defendant was owner of the ship *Science, Thomas Howard,* master, and received on board, at *New-York,* a quantity of goods

3

belonging to the plaintiffs, to be carried to *London*. The bill of lading stated the goods to be " 19 bales and 4 boxes of merchandises, the sole property of the shipper, &c. being marked and numbered as in the margin, and are to be delivered, &c. at *London*, (the danger of the sea excepted,) unto *Effingham Lawrence and Sons*, or their assigns, he or they paying freight for the same 12*l.* 4*s.* 2*d.* sterling, for the whole, with primage and average accustomed." In witness, &c. Dated 28th *December*, 1805, signed, " Contents unknown to *Thomas Howard*."

The declaration contained a special count on the bill of lading, and general counts against the defendant, as a carrier, for the value of 151 pounds of nutmegs, parcel of the merchandises mentioned in the bill of lading, which the plaintiffs alleged had been lost or embezzled, between the time of the shipment of the goods, at *New-York*, and the return of them to the plaintiffs, in *New-York*.

The cause was tried at the *New-York Sittings*, in *December*, 1808, before Mr. Justice *Spencer*.

At the trial, the bill of lading was produced and admitted; it was also admitted by the plaintiffs, that the vessel sailed from *New-York*, a few days after the date of the bill of lading, and proceeded directly to *London*, where she arrived in safety with the merchandise on board. On her arrival at *London*, it was found that the goods were not admissible, and the master was prevented by law from delivering them to the consignees, or discharging them from the ship ; in consequence of which, and to avoid seizure, it was agreed between the master and the consignees, that the goods should remain on board, and be returned to the plaintiffs in *New-York*, at the return of the ship there. Pursuant to this arrangement, when the ship was about leaving *London*, on her return to *New-York*, the following endorsement was made on one of the bills of lading : " The within goods not being allowed to be imported into the port of *Lon-*

*don,* are returned to the shippers, at their own risk, who are to pay 20*l.* 7*s. sterling,* for freight, and 5 *per cent.* primage. *London,* 24th *March,* 1806. Freight 1*s.* 6*d.* per foot. (Signed,) *Eff. Lawrence and Sons, Thomas Howard.*" The vessel sailed from *London* the 24th of *March,* 1806, and arrived at *New-York,* in *May* following; and 19 bales, mentioned in the bill of lading, (containing *gum copal,* and two of the *four* boxes, (containing *mace,*) were delivered to the plaintiff; the two remaining boxes (which contained nutmegs) were offered to the plaintiffs, who refused to receive them, alleging as a reason for their refusal, that a deficiency or loss on the weight had taken place of 151 pounds, between the first shipment, and their return. The two boxes were thereupon sent to the public stores.

To prove the deficiency, the plaintiffs produced two clerks and the public weigher, who weighed the boxes on the wharf, when they were first shipped, and afterwards, when the ship returned; and the difference between the former and latter weight was 151 pounds. The witnesses also testified, that the boxes were in good order, well hooped and covered with sacking, when they were shipped; that when they were returned, the hoops were loose, and the covering of one of them broken. The nutmegs cost 3 dollars and 25 cents the pound; and the plaintiffs paid the defendant the full freight on the 27th of *October,* 1805; and commenced the present suit for the 151 pounds so deficient.

The mate of the ship testified, that the boxes were carefully and securely stowed in the after cabin, near the floor, and where they remained, until the rest of the cargo was discharged, when they were removed to the hold, and secured under lock and key; that when the ship arrived at *Gravesend,* on her way to *London,* two custom-house officers came on board, and continued on board all the time the ship was in port, and until she passed *Gravesend* again, on her return to *New-*

*York.* The officers came on board, in the first instance, to superintend the discharge of the cargo, and afterwards continued on board, day and night, to guard the goods of the plaintiffs, which were not admitted, to prevent them from being smuggled on shore; that when any of the crew went on shore, they were carefully examined by the officers, to ascertain whether they had any thing which they were not permitted to take. During all the time, in order to ascertain the situation of the goods, the custom-house officers demanded, and had access to them, and the hold was opened for that purpose, and they went into the hold and came out, at pleasure. That when the return cargo was about to be taken in, the boxes were taken by the witness from the hold, and carefully stowed, under the cabin floor, in such a situation as to be inaccessible by any one, without the knowledge of the witness, and where they continued until they were discharged in *New-York;* that he did not know or believe, that there had been any embezzlement of them, or that any person had access to them, except himself and the custom-house officers; that the boxes appeared to be in as good order when they were returned, as when they were first shipped, and he could not discover any appearance of their having been opened or injured, except some of them slightly.

It was admitted that embezzlements were frequently committed by the custom-house officers in *London*, of goods under their care.

The judge charged the jury, in substance, that the only question of fact before them was, whether any loss or deficiency of the nutmegs had taken place between their shipment and their return; and if so, what was the extent of such loss or deficiency; for if such a loss had happened, nothing had been shown to excuse the defendant from his responsibility. Though the nutmegs had been embezzled by the custom-house officers in *Lon-*

*Margin:* ALBANY, August, 1810.

SCHIEFFELIN and another v. HARVEY.

*don*, yet the defendant was liable ; that no inference was to be drawn from the endorsement on the bill of lading, that the master, on the one hand, meant to assume or engage that the original quantity of nutmegs still remained in the boxes ; nor, on the other, to restrict his or his owner's responsibility, or to vary it from the terms of the original contract; it amounted merely to a continuance or revival of the contract entered into by the bill of lading.

The jury, when they gave in their verdict, declared, that they found a deficiency in the nutmegs between the time of their shipment and their return, to the extent claimed by the plaintiffs, but that some of them differed in opinion in regard to the endorsement on the bill of lading, believing that the parties thereby intended to place the property on the return voyage wholly at the risk of the plaintiffs ; and with this explanation, they found a verdict for the plaintiffs, for 490 dollars and 75 cents.

A motion was made, on the part of the defendant, to set aside the verdict, and for a new trial.

*P. W. Radcliff*, for the defendant. The rule of law in *England*, in regard to common carriers, laid down in the case of *Coggs* v. *Barnard*,* is extremely severe ; and independently of the custom of *England*, a common carrier would only be liable as a *bailee for hire.* There has been no negligence or default on the part of the defendant or his agents. If a loss has happened, it has proceeded from the custom-house officers at *London*, over whom the master had no control. The property was placed in this situation by the ignorance or the misconduct of the plaintiffs, in sending goods to *London*, which by the laws of *England* could not be admitted. The justice of the case, therefore, is most clearly with the defendant.

The shipper of goods is chargeable with a knowledge of the laws of trade at the port of destination. The bill

* 2 Ld. *Raym.* 909.

of lading expressly mentions, that the contents of the boxes were unknown to the ship-master or ship-owner. This precluded every inference of knowledge on his part; nor can he be responsible for the quality or quantity of the article.*(a) The master cannot take on board any contraband or prohibited goods, by which the ship and other parts of her cargo may be liable to seizure or detention.† So, on the other hand, the merchant cannot put prohibited goods on board, which might subject the vessel to seizure or detention. This would be such a fraud, as would vitiate the contract. In case of an insurance on goods, the insurer is answerable only during a reasonable time, after their arrival, till they can be conveniently landed.‡ Here a reasonable time for the unlading at *London*, had elapsed.

ALBANY,<br>August, 1810.

SCHIEFFELIN<br>and another<br>v.<br>HARVEY.

* Abbott, part<br>3. c. 2. s. 4,5. Va-<br>lin, liv. 3. art.<br>2.<br>† Abbott, part<br>3. c. 3. s. 3.<br>Molloy, book 2.<br>c. 2. s. 6. Roc-<br>cus, n. 66.

‡ Marsh. on<br>Ins. (2 ed.) 256,<br>257.

Again, it was the fault of the plaintiffs, that the goods were not delivered in *London*. And putting the defendant on the most disadvantageous ground, that of an insurer, he would not be liable; for an insurer is not responsible for any loss or damage proceeding from the fault of the insured.§

§ Marsh. (2<br>ed.) 315. Poth.<br>Trait. des Ass.<br>n. 65.

From the time of the arrival of the goods, and the refusal to permit them to be landed, the defendant ceased to be a common carrier, and is to be considered as a mere bailee for hire, and is answerable only for his fault or negligence.¶

¶ Gibbons v.<br>Paynton, 4<br>Burr. 2298.

If goods be taken out of the hands of a common carrier by the owner, or by an execution against the owner, or by an act of government, the carrier is not liable for them. In the present case, the goods must be considered as taken from the master by the custom-house officers, and as in their custody.

A common carrier may make a special acceptance, and will, in such case, be answerable only, according to the

(a) In the case of the *Oster Risver*, (4 *Rob. Adm. Rep.* 199) Sir *William Scott* said, that the master could not be admitted to aver his ignorance; he was bound, in the time of war, to know the contents of his cargo. This, however, was relative to articles contraband of war.

ALBANY,
August, 1810.

SCHIEFFELIN
and another
v.
HARVEY.

*Abbott, (3 ed.)
218. part 3. c. 2.
s. 3.

terms of such acceptance ; and various exceptions may be
introduced in bills of lading, so as to take away the respon-
sibility of the master and owners, in cases in which they
would otherwise be liable.* Here there was an express
agreement between the master and consignee, the agent
of the plaintiffs, endorsed on the bill of lading, by which the
terms of the original contract were varied, and the goods
put at the risk of the plaintiffs.

*Colden*, contra. The master of a ship, as a common
carrier, is responsible for every misfortune, loss or da-
mage, to goods which he has undertaken to transport,
whether it happens through the negligence, wilfulness or
ignorance of himself, or his crew, or any other person.†(a)
The law on this subject is strict. Even if the master puts
goods in a cabin, and delivers the key of it to the owner of
the goods, and says he will not be responsible, if a loss
happens, yet he will be answerable if the goods are stolen.
He is answerable for every accident or injury which
might have been prevented by human foresight or care.‡
    It is not a fact, that the defendant ceased to be a common
carrier, in relation to these goods, after the refusal to
admit them ; the agreement endorsed on the bill of lading
shows his continuance in the character of a carrier. The
true meaning of the endorsement is, that the goods
should remain on the same terms as on the outward voy-
age, and at the risk of the consignors, and not of the con-
signees. The clause " at the risk of the shippers," was
clearly intended for the benefit of the consignees, who
returned the goods, and to save their responsibility, in
case of loss. The master still remained equally liable in
case of any embezzlement.
    Admitting that the plaintiffs knew, when they shipped
the goods, that they could not, by the laws of *England*, be

† 2 Peters's
Adm. Dec. App.
74—91.

‡ Abbott, part
3. c. 3. s. 9.

(a) The *Treatise* mentioned in *Peters's Admiralty Decisions*, is taken
from the *Sea Laws*, p. 442. the author of which has extracted it from *Mol-
loy de jure maritimo, book* 1. c. 1, 2, and 3.
2

landed there, this would not excuse the master from his responsibility as a carrier. He would only be excused from a delivery of them there, and would be entitled to his freight out, and for bringing them back. But it does not appear that the plaintiffs did know that the goods were prohibited in *England*.

It is not proved that the custom-house officers did, in fact, embezzle the nutmegs; but if they did, still I contend, under the general and settled law on this subject, the defendant is answerable.

VAN NESS, J. delivered the opinion of the court. I am entirely satisfied with the finding of the jury on the matter of fact which was submitted to their consideration by the learned judge before whom the cause was tried. The loss of a part of the nutmegs was satisfactorily proved by the plaintiffs' witnesses, and their evidence is not shaken by what was testified by the mate, even admitting what he swore to have been believed by the jury. It is altogether probable that the nutmegs were purloined by the custom-house officers, while they were stowed in the ship's hold, in *London*. But this is a loss for which the defendant is liable, unless the special circumstances which attended it, or the particular contract between the master and consignees, take this case out of the general rule of law.

The master and owners are responsible for every injury that might have been prevented by human foresight or care. They are liable for goods stolen or embezzled on board the ship, by the crew or any other persons, although no negligence may be imputable to them. The rigour of the law in this respect arises from reasons of public policy, and to prevent the combinations that might be made with thieves and robbers. (1 *Marsh. Ins.* 156, 157. *Abbott on Ship.* 182. 202. 196. *part* 3. c. 2. s. 3. *Morse* v. *Slue*, 1 *Ventr.* 190. 238. *T. Raym.* 220. *Molloy*, *book* 2. c. 2. s. 12. *Hob.* 17. *Cro. Jac.* 330.)

It is, however, insisted, for the defendant, that after the master was prevented from delivering the goods, by reason of their being prohibited articles, he is no longer to be regarded in the light of a common carrier, but as a mere bailee, and so liable for negligence only.

In giving my opinion upon this part of the case, I lay out of view the imputation upon the plaintiffs, that they fraudulently shipped prohibited goods. Such a measure would be without any assignable motive, and the charge is moreover repelled by the fact stated in the case, that it " was found on the arrival of the ship at *London*, that all the goods mentioned in the bill of lading were inadmissible." The just inference from this is, that until the arrival of the ship at *London*, this fact was equally unknown to both parties ; and if so there was no fraud or fault imputable to the plaintiffs. As soon as it was discovered that the goods could not be landed, a new contract was made between the consignees and the master, by which the latter agreed to suffer the goods to remain on board, until he should sail for *New-York*, and that he would carry them back to the owners there, by the return of the ship ; and pursuant to that agreement, on the day the ship sailed from *London*, the endorsement stated in the case, was made on the bill of lading, and the amount of the freight was thereby fixed and determined. Here was a complete contract for conveying the goods in question from *London* to *New-York*, for a stipulated compensation ; and from the time it was entered into, the goods were in the master's charge, as a common carrier ; and he became bound to deliver them in the same state in which they were shipped ; and he, as well as the owner, was answerable for all loss or damage for which common carriers are by law made liable. What, then, is there in this case to exempt the defendant from making good the loss which occurred ? It is said, that the nutmegs must have been stolen by the custom-house officers, while they were on board the ship, and had access

to them, in order to prevent them from being smuggled on shore. But this is no excuse. It was the duty of the master to guard against such accidents ; and if he has neglected to do it, or been so unfortunate as not to detect the theft, if one was committed, he, and not the shipper, must bear the loss. This was one of the risks which he agreed to assume; and he must have known that some persons, in all probability, would be stationed on board, to guard against any attempt to run the goods, because such a precaution was both reasonable and right.

The master was left in the full possession of the ship, and his control over her and her cargo, except as it related to the landing of the goods in question, was as complete as if the custom-house officers had not been on board.

This distinguishes the present from cases where it has been held, that during the period of detention by captors, *as prize*, or by the belligerent for adjudication, all the responsibilities of the master and crew are suspended.

In such cases, the master is temporarily deprived of his command ; but such was not the effect of having the custom-house officers placed on board of this vessel, for purposes altogether different and justifiable.

To admit such an excuse as this would be opening the door to all the evils to be apprehended from fraudulent combinations and collusions between the master and the crew and other persons, which it was the policy of the law to prevent.

But it is said, that by the endorsement on the bill of lading, " it was agreed, that the goods were to be returned to the shippers at their own risk," and that this amounts to a special acceptance of them by the carrier. I am not prepared to say, what precisely was intended by the introduction of those words. I should be inclined, were it necessary to express an opinion, to adopt the construction given to them by the learned judge on the trial. Per-

ALBANY,
August, 1810.

SCHIEFFELIN
and another
v.
HARVEY.

haps it was a mere cautionary measure, on the part of the consignees, to save themselves from all responsibility, for having reshipped the goods, before they had an opportunity to consult their principals, without having them insured. But I am very clear, that it never could be designed to throw a loss that might arise from embezzlement, by the crew or others, upon the shipper. Such a construction would exonerate the captain from all the risks for which he would otherwise have been liable, which would be going much farther than the terms of the contract would warrant.

It is undoubtedly true, that the general operation of law may be controlled by the agreement of the parties. But such agreement ought to be clear, and capable of but one construction, unequivocally and necessarily evincing that such was the intention of both the parties.

The freight which the plaintiffs were to pay from *New-York* to *London* was, as appears from the bill of lading, 12*l.* 4*s.* 2*d.* sterling, and for carrying them back they were to pay 20*l.* 7*s.* sterling, being a difference of 8*l.* 2*s.* 10*d.* This fact, I think, has some weight to show that such a freight would not have been paid, if the master was to be exonerated from all liability for any loss that might accrue in the transportation, except such as should arise from negligence only. The court are of opinion, therefore, that the motion for a new trial should be denied.

Judgment for the plaintiffs.