## Case No. 5,513.

### The GOLD HUNTER.

[Blatchf. & H. 300.] [1]

District Court, S. D. New York. Oct. 19, 1832.

MARITIME CONTRACTS—BILL OF LADING—RIGHTS OF PARTIES—LIEN—SALE OF CARGO TO EFFECT REPAIRS — CARRIERS — DEPREDATIONS BY PASSENGERS — PERIL OF THE SEA — MEASURE OF DAMAGES.

1. A bill of lading is a contract maritime in its character, and within the jurisdiction of courts of admiralty, whether it be made on land or on the high seas.

[Cited in The Gilbert Knapp, 37 Fed. 212.]

2. The owner of goods which are shipped and are not delivered according to the bill of lading, has a lien upon the vessel, for the value of the goods, which may be enforced in admiralty by an action in rem.

[Cited in The Boston, Case No. 1,669; Dupont de Nemours v. Vance, 19 How. (60 U. S.) 170.]

3. The owner of cargo, part of which is sold by the master to raise money for the necessary repairs of the vessel, and part of which is consumed by the crew and passengers on the voyage, has a lien on the vessel for the value of what is so sold and consumed.

[Cited in Dupont de Nemours v. Vance, 19 How. (60 U. S.) 170.]

4. Owners of ships which are employed in transporting goods for hire, are common carriers.

5. Depredations on a ship's stores or on her cargo, committed by her passengers or crew, in consequence of a short allowance made necessary by the length of a voyage, is not a peril of the sea, within the meaning of a bill of lading.

6. Where a libel is brought for the non-delivery of goods according to a bill of lading, the measure of damages is the current value of the goods at the port of destination at the time when the goods ought to have been delivered, with interest from that time.

[Cited in The Nith, 36 Fed. 96.]

In admiralty. This was a libel in rem, setting forth that the libellant had shipped at Havre, on board the ship Gold Hunter, 6,084 bottles of wine, consigned to his agent in New-York; that 58 baskets of the wine mentioned in the bill of lading, of the value of $600, had not been delivered; and that, of the wines so missing, a portion was sold at Halifax, where the ship put in, in distress, to raise money for her necessary repairs during her homeward passage, and the rest was embezzled and consumed by the passengers, who were permitted, on their arrival in New-York, to leave the ship with their baggage and effects. The claim was for the value of the wines. The answer of the owners of the vessel, one of whom was the master, excepted to the jurisdiction of the court, alleging that the cause of action, if any existed, arose only upon a bill of lading made at Havre, in France, and not upon the high seas. It also denied the existence of any lien upon the vessel for the demand. It ap-

peared in evidence, as to the wines alleged to have been embezzled, that it became necessary, during the voyage, to put all on board on short allowance; that the passengers were, in consequence, almost in a state of mutiny; and that the master and crew were unable to restrain them from using a portion of the wines of the libellant. Of the wines sold at Halifax, some sold for more and some for less than the current value of the same wines in New-York.

Francis B. Cutting, for libellant.

William Emerson, for claimants.

I. The term "admiralty and maritime jurisdiction" in the constitution, and in the judiciary act, signifies, that jurisdiction which was exercised by the admiralty courts of England at the time of the declaration of Independence. The jurisdiction exercised in the United States at the time of the Revolution, cannot be taken as the standard, since it was too loose and extensive, besides being uncertain and varying in different parts of the country; nor can the jurisdiction exercised in England at the time of the emigration to this country, since the emigration took place at no one fixed time, and it would be equally uncertain with the other. The extensive jurisdiction of the admiralty, in derogation of the trial by jury, was one of the sources of complaint at the time of the Revolution. The terms "admiralty" and "maritime" are synonymous, and do not operate to enlarge or affect each other. Where admiralty jurisdiction exists, it is made exclusive in the courts of the United States, by act of congress; and, therefore, the uniform course of decisions in the state courts upon bills of lading, must be overthrown, if the subject matter is one of admiralty cognizance. At the time of the Declaration of American Independence, the English courts of admiralty had no jurisdiction over bills of lading.

II. Under the circumstances of this case, no lien arose. There was no possession, which is necessary to sustain a common law lien, and no express instrument of hypothecation, and the vessel is discharged, even if a personal liability of the master or owners is shown.

BETTS, District Judge. The point raised, in this case, as to the jurisdiction of the court, is to be determined by the consideration, whether the subject matter of the suit is of a maritime character. Subjects of a maritime nature, which pertain to the cognizance of courts of admiralty, are those touching things done upon, or in relation to the sea; in other words, all transactions and proceedings relative to commerce and navigation, and to damages and injuries done upon the sea. Charter-parties and contracts of affreightment are appropriately considered as within the scope of those powers, and jurisdiction is exercised by admiralty courts

[1] [Reported by Samuel Blatchford, Esq., and Francis Howland, Esq.]

over those classes of cases. Policies of insurance and bills of lading are regarded as included within the same principle. De Lovio v. Boit [Case No. 3,776]; Drinkwater v. The Spartan [Id. 4,085].

It is not denied that subjects of the character of the one involved in this action were, at an early period, within the ordinary jurisdiction of the English admiralty. It is supposed, however, that the jurisdiction has, to that extent, been abrogated or restrained by the adjudications of courts of common law, from a period anterior to our Revolution. Johnson, J., in Ramsay v. Allegre, 12 Wheat. [25 U. S.] 621. Although the common law decisions in England, and the prohibitions which followed them, may have suspended or abolished the ancient powers of the admiralty, that fact does not necessarily determine the limits of the jurisdiction under the jurisprudence of the United States. The signification of the phraseology employed in our constitution is not determined by the sense in which the same expressions were used in the English jurisprudence, except as to those terms which had a notorious common law meaning. Those terms which are derived from the civil law, or are expressive of the functions of courts acting under that system, are expounded upon the general principles which govern the interpretation of language, or by historical evidence of the mode in which the same terms were ordinarily employed in the administration of that system. In view of the American authorities on this subject, it cannot be an open question with this court, whether admiralty jurisdiction is to be ascertained by consulting the expositions given by the common law courts of England, or by allowing fair force to the provisions of the constitution and laws of the United States, in connection with the doctrines and administration of the courts of other civil and maritime powers. The admiralty jurisdiction, in respect to contracts, depends upon their subject matter. De Lovio v. Boit [supra]; 2 Browne, Civ. & Adm. Law (Ed. 1799) 150, 169. A bill of lading clearly possesses the characteristics of a maritime contract. It concerns transportation by sea, and the whole service and consideration contemplated by the parties to it, relate to navigation and to maritime employment. The transaction covered by it is one of navigation and commerce on navigable waters—in this case, upon the high seas. The contract is, then, in its essence and nature, maritime, and is subject to the cognizance of this court, whether entered into on land or on water. The Rebecca [Case No. 11,619]. The exception to the jurisdiction is, therefore, overruled.

The questions which remain relate to the measure and mode of relief applicable to the facts, and to the competency of a court of admiralty to administer it. Two principles have an important bearing on the subject, one of which principles rests in the doctrine of the

common law, and the other is drawn from the Commercial and Maritime Codes. The first is not open to contestation, and is, that the owner of a general ship is chargeable with the responsibility of a common carrier for goods transported at sea. 2 Kent, Comm. 608, 609; Story, Bailm. §§ 496, 501; Allen v. Sewall, 2 Wend. 327. The other proposition—that the ship is responsible to the shipper, on the undertaking of the master in the bill of lading, for cargo laden on board—is less familiar in the adjudications of the courts, but may now be affirmed to be solidly imbedded in the elements of commercial law. Cons. del Mare, cc. 104–106; Molloy, bk. 2, c. 3, § 9; Abb. Shipp. (Ed. 1829) 94, 170; The Packet [Case No. 10,-654]; 2 Browne, Civ. & Adm. Law (Ed. 1799) 156; 3 Kent, Comm. 220. It is becoming an equally familiar principle in this country, that a contract of affreightment is within the admiralty jurisdiction, and that a remedy in rem, against the ship, will be afforded in that court for a default of the master in performing the contract. Bulgin v. The Rainbow [Case No. 2,116]; De Lovio v. Boit [supra]; The Jerusalem [Case No. 7,294]; Zane v. The President [Id. 18,201]; Drinkwater v. The Spartan [Id. 4,085]; The Rebecca [Id. 11,619]. The subject-matter of the contract concerns the navigation of the seas, and affects the ship, her freight and cargo. The lading, transportation and unlading are sea services, and the engagement in the bill of lading, for the performance of those services, is of a maritime character, and imparts a lien, and binds the ship to the performance. The General Smith, 4 Wheat. [17 U. S.] 443; The Jerusalem [supra]; Molloy, bk. 2, c. 3, § 9; Cons. del Mare, cc. 105, 106; 2 Browne, Civ. & Adm. Law (Ed. 1799) c. 5. The lien thus secured is appropriately enforced by process in rem, in admiralty.

Satisfaction is sought, in this action, for the loss of cargo, occasioned by the plunder and consumption of some of the wines on the passage from Havre to Halifax, the port of distress, and also for the portion disposed of by the master at Halifax, to obtain funds for the necessary refitment of the ship. The necessity for the repairs is not questioned, nor is it contended that the master had any resources for their supply in that port, other than the cargo. Under such circumstances, the law justifies the master in appropriating so much of the cargo as may be required for the necessities of the voyage. Cons. del Mare, cc. 105, 106; Laws of Oleron, art. 22; Laws of Wisbuy, arts. 35, 45; The Gratitudine, 3 C. Rob. Adm. 240. Our maritime courts hold that, in such case, the ship is responsible to the owner of the goods, and that a lien for their value arises, which can be enforced in rem, against the ship. The cases of Bulgin v. The Rainbow [supra] and of The Packet [supra] support this proposition. See, also, 3 Kent, Comm. 220. A distinction may be attempted to be drawn between an appropriation of the cargo, in aid of the ship, by the

voluntary act of the master, after her arrival in a port of safety, and a mere failure or neglect to deliver it to the consignee; as the former is an incident of the perils of the sea, and might, perhaps, fall within the exceptions in the bill of lading, against responsibility for losses by those perils. I am inclined, however, to follow the American authorities on this subject; because, although a peril of the sea produced the necessity for the repairs which were made, and thus indirectly led to the use of the libellant's property for the benefit of the ship, yet such peril was not the proximate cause of the loss of the goods. They were disposed of at the option and selection of the master, to raise funds in aid of the voyage, which was interrupted or delayed by such peril. In that view, I think the broad principle would aptly apply, that the ship is answerable for the safe carriage of the goods, and for their delivery to the consignee, even without the aid of the further principle, that the act of the master, in so appropriating the goods for the service of the ship, creates a charge on the ship for their value. The equity of the first mentioned rule is manifest; for the foreign shipper trusts to the ship, as an open letter of credit from her owners, and furnishes supplies on that authority alone, since, ordinarily, he can know nothing of the personal responsibility of the owners.

The same principle covers equally the wines sold by the master in Halifax, and those consumed on the passage by the passengers and crew. Those depredations constitute no excuse to the owners, for the non-fulfilment of their contract of carriage. Abb. Shipp. 222; 2 Kent, Comm. 609; Morse v. Slue, 1 Vent. 190, 238; Schieffelin v. Harvey, 6 Johns. 170. And the value of the property so lost is a charge on the vessel. Cons. del Mare, cc. 209, 212; 2 Molloy, bk. 2, c. 3; American Ins. Co. v. Coster, 3 Paige, 323; Ross v. The Active [Case No. 12,070]. I shall, accordingly, decree to the libellant the value of the deficiency in his shipment, with costs.

The goods having been deliverable here, and only a part of them having been brought to their port of destination, the libellant is entitled, in reimbursement of the deficiency, to recover the market value, at this port, of the goods lost, with interest. That seems to be the measure of damages for deficiency of cargo, except, perhaps, in cases of average adjustment. Watkinson v. Laughton, 8 Johns. 164. And interest is an equitable remuneration to the owner for being deprived of the use of his capital, after the ship was bound to put it in his possession. Neither the price brought by the wines sold at Halifax, nor their invoice cost, nor their value at the place of shipment, furnish the rate of compensation under the contract of affreightment.

An order must be entered, referring it to the clerk to ascertain the value of the goods, under these directions, and also to ascertain, the freight, primage and other necessary charges due from the libellant to the ship; and, if a balance is found due to the libellant, process for its recovery may be awarded at his instance.